Slip Op. 18-98

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SEAH STEEL VINA CORPORATION,<br><br>          Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br> and<br><br>MAVERICK TUBE CORPORATION,<br>UNITED STATES STEEL CORPORATION,<br>BOOMERANG TUBE LLC, ENERGEX<br>TUBE (A DIVISION OF JMC STEEL<br>GROUP), TEJAS TUBULAR PRODUCTS,<br>TMK IPSCO, VALLOUREC STAR, L.P., and<br>WELDED TUBE USA INC.,<br><br>          Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Consolidated Court No. 14-00224 |

**OPINION AND ORDER**

[The court sustains the determinations of the U.S. Department of Commerce.]

Dated: August 13, 2018

*Jeffrey M. Winton*, Law Office of Jeffrey M. Winton PLLC, of Washington, D.C., for plaintiff.

*Agatha Koprowski*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel on the brief was *Catherine D. Miller*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Jeffrey D. Gerrish* and *Luke A. Meisner*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, D.C., for defendant-intervenor United States Steel Corporation.

*Alan H. Price*, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor Maverick Tube Corporation.

*Roger B. Schagrin*, Schagrin Associates, of Washington D.C., for defendant-intervenors Boomerang Tube LLC, Energex Tube (a Division of JMC Steel Group), Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Goldberg, Senior Judge: This appeal arrives after the court's second remand to the U.S. Department of Commerce ("Commerce" or "the Department") from challenges by SeAH Steel VINA Corporation ("SSV") to the Department's antidumping duty determination for oil country tubular goods ("OCTG") from the Social Republic of Vietnam ("Vietnam"). *See Certain Oil Country Tubular Goods from the Social Republic of Vietnam*, 79 Fed. Reg. 41,973 (Dep't Commerce July 18, 2014) (final determ.) and accompanying Issues & Decision Mem., as amended by *Certain Oil Country Tubular Goods from India, the Republic of Korea, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 53,691 (Dep't Commerce Sept. 10, 2014) (amended final determ.).  Previously, the court had remanded this case twice to Commerce.  *SeAH Steel VINA Corp. v. United States*, 40 CIT __, 182 F. Supp. 3d 1316 (2016) ("*SeAH I*"); *SeAH Steel VINA Corp. v. United States*, 41 CIT __, 269 F. Supp. 3d 1335 (2017) ("*SeAH II*").  In its most recent Remand Redetermination, Commerce addressed certain topics as directed by the court's remand order.  *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 179 (Feb. 8, 2018) ("Remand Redetermination").  The court now reviews those findings, sustaining Commerce's determinations on all issues.

## BACKGROUND

The court assumes familiarity with the facts and law as discussed in its prior opinions, *see SeAH I*, 182 F. Supp. 3d at 1316; *SeAH II*, 269 F. Supp. 3d at 1335, and summarily recounts only the pertinent details of the instant appeal below.

Commerce issued its Remand Redetermination on February 8, 2018, addressing three

issues: 1) the surrogate value ("SV") for hot-rolled coil J55-H, Remand Redetermination at 2–7,

20–21; 2) the valuation of domestic inland insurance, *id.* at 7–11, 23–27; and 3) the allocation of

domestic brokerage and handling ("B&H") costs, *id.* at 11–18, 29–35.  Regarding the SV for hot-

rolled coil, the Department determined that it was more appropriate to value the J55-H using "the

average of SSV's [market economy ("ME")] purchase prices of J55-H in the year prior to the

[period of investigation ("POI")], and adjusted to the POI using an inflator."  *Id.* at 21.  In so

doing, Commerce rejected data from the harmonized tariff schedule ("HTSUS") 7208.37.00

because it was, as a "basket category," overly broad in that it could capture "all non-alloy steel

with width greater than 600 millimeters, rather than just J55-H."  *Id.* at 6.  Next, Commerce

supplemented the record with a more legible version of a document, the Agro Dutch data

worksheet, and continues to use this document to calculate a SV for inland insurance.  *Id.* at 23–

24.  While the Department did omit the values for marine insurance, Commerce continues to

interpret and apply the Agro Dutch values over SSV's objections.  *Id.* at 23–27.  Last, Commerce

continues to value domestic B&H costs using data from a report titled *Doing Business India:*

*2014* ("Doing Business Report").  *Id.* at 35.

## JURISDICTION AND STANDARD OF REVIEW

This dispute arises under 28 U.S.C. § 1581(c) and, thus, the court will sustain

Commerce's determinations unless they are "unsupported by substantial evidence on the record,

or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Doing so requires that

the court assess the Department's reasoning under the arbitrary and capricious standard and

review its factual findings for substantial evidence.  *See Changzhou Wujin Fine Chem. Factory*

*Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012).

## DISCUSSION

In this most recent challenge, SSV presents several arguments, all couched within an overarching accusation of bad faith by the Department.  The court addresses the bad faith argument and then each of the subsequent challenges to individual findings below.

### I.  Bad Faith

SSV relies primarily on two cases to suggest that the court ought to infer bad faith based on an allegation of malicious prosecution by Commerce and its arbitrary, results-based findings. *See* Pl.'s Comments on Commerce's Redeterminations 3 n.3, ECF No. 183 (Mar. 12, 2018) ("Pl.'s Comments") (citing *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1311 (Fed. Cir. 2013); *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000)).  But, as the Federal Circuit has made clear, "[s]ubjective bad faith is difficult to prove directly, essentially requiring the discovery of a smoking gun," *Kilopass*, 738 F.3d at 1311, circumstances not met—nor hardly even identified—here.  Instead, SSV attempts to indirectly demonstrate Commerce's predisposition by pointing to a laundry list of "rationalizations that make no sense," Pl.'s Comments at 6, which SSV asserts make "an inference [of bad faith] abundantly warranted," *id.* at 3.  Yet, put simply, a party's mere disagreement with Commerce's findings —however adamant and genuinely held it may be—in no way establishes bad faith.

What's more, when such an accusation of bad faith is lodged against the government, the burden of proof is even higher.  In order to demonstrate that Commerce has acted in bad faith, SSV must present clear and convincing evidence to overcome the ordinary presumption that the government has acted in good faith.  *See SKF USA Inc. v. United States*, 29 CIT 969, 971, 391 F. Supp. 2d 1327, 1329 (2005).  Suffice it to say, SSV has not met this heightened burden and its argument of bad faith is unsupported by the entirety of the circumstances found in the record.

## II.  *SeAH II* Remand Redetermination

The court remanded to Commerce to either further explain or modify its findings with respect to three different areas: 1) the Department's decision to discard SSV's purchases of J55-H as a SV for J55-H, 2) the calculation of inland insurance by use of the Agro Dutch data, and 3) the allocation of B&H costs.  *SeAH II*, 269 F. Supp. 3d at 1365.

### A.  *Purchases of J55-H Coil*

In its remand order, the court expressed a concern that Commerce had failed to adequately explain its valuation of J55-H hot-rolled coil.  Specifically, the court could not discern why "Commerce decided to optimize accuracy by using [SVs] specific to the three variations of J55 HRC" and "discarded the more specific [SV]—SSV's actual ME purchases— because the sales occurred about six months before the POI."  *Id.* at 1344.  At that time, the court lacked the tools to "yet say that Commerce's decision was reasonable." *Id.*  Thus, the court directed Commerce "to either provide a more exhaustive explanation of its preference or, alternatively, to change its preference." *Id.*

In its Remand Redetermination, Commerce recalculated the surrogate value for J55-H, selecting data from ME purchase data over the non-specific HTSUS 7208.37.00 information. Remand Redetermination at 4–7, 20–21.  Commerce did concede that "in weighing contemporaneity versus specificity, [it] did not [previously] attach sufficient weight to the specificity of the SVs in [its] analysis in the First Remand Redetermination." *Id.* at 5. Ultimately, Commerce concluded that "the ME purchase data that is more specific and would require an inflation adjustment of only six months is the superior data source when compared with a less specific (*i.e.*, basket category) and three months more contemporaneous data source." *Id.* at 21.  Therefore, the Department discarded the HTSUS 7208.37.00 information because that

"is a 'basket category' that may contain all non-alloy steel with width greater than 600

millimeters, rather than just J55-H and, thus, is not specific to the input." *Id.* at 6–7.

SSV challenges Commerce's findings in this area, advocating that Commerce ought to

have pursued an alternative in valuing J55-H: SSV's actual ME purchases of the subject

merchandise. Arguing that since the "simultaneous purchases of J55 and J55H coil [in

September 2012] demonstrated that the prices were the same," SSV asserts that "appl[ying] []

this historical price ratio requires the conclusion that the prices for J55 and J55H coils would also

be the same during the investigation period." Pl.'s Comments at 9. In response, the Government

argues that SSV's proposed alternative of using a single transaction would be less specific.

Rather, the Government contends that there is "no record evidence of market economy purchases

of J55-H hot-rolled coil during the [POI]" and Commerce resultantly "considered several

imperfect options for selecting a [SV]." Def.'s Resp. to Comments Regarding the Remand

Redetermination 10, ECF No. 188 (Apr. 11, 2018) ("Def.'s Comments"). At the end of the day,

the Government maintains that Commerce decided "that SSV's purchases of J55-H hot-rolled

coil shortly before the [POI] were the best information available to determine the [SV] of J55-H

hot-rolled coil because they were the most specific record evidence, predated the [POI] by less

than one year, and could be made contemporaneous with an inflator." *Id.*

Commerce was faced with choosing between two imperfect alternatives: it could either

select the HTSUS 7208.37.00 "basket category," which may be less specific in that it may

contain more than just J55-H, or it could examine ME purchase prices specific to the subject

merchandise, which pre-date POI (albeit by less than one year). It chose the latter, applying an

inflation adjustment in an effort to remedy the infirmities of that data.

As this court has stated—and the court here referred to in *SeAH II*, 269 F. Supp. 3d at 1344—when "Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable." *CS Wind Vietnam Co. v. United States*, Slip Op. 14-128, 2014 WL 5510084, at *3 (CIT Nov. 3, 2014) (quoting *Catfish Farmers of Am. v. United States*, 33 CIT 1258, 1273, 641 F. Supp. 2d 1362, 1377 (2009)).   But, when doing so, the court requires that Commerce supply a "well-reasoned decision, sufficiently explaining" the agency action from which the court can derive "the analytical path [Commerce] undertook to arrive at its conclusions." *See Inner Mongolia Jianlong Biochemical Co. v. United States*, 41 CIT __, __, 279 F. Supp. 3d 1332, 1337 (2017).   Having now provided a detailed explanation of its practices and reasoning in this space, Commerce has adequately explained its ultimate decision to prioritize specificity over contemporaneity.

Whereas before Commerce had provided "scant explanation," *see SeAH II*, 269 F. Supp. 3d at 1344, the Department has now given a more detailed explanation of its practice.   In comparing the strengths and weaknesses of the data (including ways in which the flaws could be mitigated), Commerce has assessed the quality of the data more fully.   Commerce's preference of specificity in this instance is reasonable because specificity is one of the primary considerations in determining the "best available information."   If a set of data is not sufficiently specific, it is of substantially lesser import whether that data satisfies the other criteria, such as contemporaneity, because a lack of specificity—from including products dissimilar to the subject merchandise—substantially increases the risk of distortive effects in the data.   As a result, the Department's preference is neither arbitrary nor capricious.

SSV offers a third surrogate for consideration: SSV's market economy purchases of "regular" J55 hot-rolled coil.  In support, SSV cites a single September 2012 transaction in which it purchased J55 and J55-H hot-rolled coil at the same price.  This proffered alternative does not adequately address the specificity problem because its accuracy is based on a single transaction, the applicability of which cannot be ascertained from the information on the record. The fact that J55 and J55-H hot-rolled coil were bought at the same price in a single transaction outside of the POR is not probative of whether the two products could always be bought at the same price.  Commerce may not elevate its desire to have contemporaneous data over the necessity for accuracy, as contemporaneity is but one factor to be considered in deciding on a surrogate value.  *See Dorbest Ltd. v. United States*, 30 CIT 1671, 1691, 462 F. Supp. 2d 1262, 1281 (2006).  What's more, SSV's proposed surrogate value is even less specific than the two other options considered by Commerce as neither Commerce nor the court has the ability to disaggregate in any meaningful way J55 and J55-H hot-rolled coil purchased at the same price in the same transaction.

Accordingly, Commerce acted reasonably and its findings are sustained.

### B.  Inland Insurance Valuation

The court, in previously addressing the issue of Commerce's valuation of inland insurance, ordered that the Department either more fully explain or reconsider its valuation of domestic inland insurance.  *SeAH II*, 269 F. Supp. 3d at 1355.  During that proceeding, SSV had cited Indian common law in an attempt to establish that it was unreasonable for Commerce to impose a SV for the cost of assigning the risk of loss, something SSV claimed was already reflected in inland freight rates.  *Id.* at 1357.  The court upheld Commerce's rejection of that argument, but concluded that substantial evidence did not support the Department's selection of

the Agro Dutch data as an appropriate SV. *Id.* This was so because it appeared that the Agro

Dutch data "reflect[ed] the cost of *both* inland insurance and marine insurance" and was inflated

because that data was applied by weight rather than by the value of the merchandise. *Id.* The

court found that the selection of this data met only two of the stated criteria Commerce considers

when selecting SV data—being publicly available and adjustable for contemporaneity—while

ignoring the other factors: that the values be product-specific, representative of a broad market

average, and tax-exclusive. *Id.* at 1357–58. As a result, Commerce was left with the task of

either fully explaining why the Agro Dutch data was the best information available or

reconsidering the selection of that data. *Id.* at 1358.

Accordingly, in its Remand Redetermination, Commerce: 1) acknowledged that the data

was too broad because it also included marine insurance and therefore removed the

corresponding adjustment from the Department's calculation but 2) disputed SSV's assertion that

the Agro Dutch data resulted in a per-ton value roughly ten times that of what it should have

been and therefore declined to reopen the record as to this issue. *See* Remand Redetermination

at 9–11. SSV highlighted several alleged defects with the document, *see id.* at 21–23, and

Commerce acknowledged "that because of the illegibility of the [Agro Dutch worksheet], it is

not certain that [the Department] correctly deciphered from the document the cost of

$12.75/kilogram as Agro Dutch's reported per-kilogram price." *Id.* at 21. As a result,

Commerce placed on the record a more legible copy of the same worksheet. *Id.* at 23. Relying

on this corrected document, the Department rejected most of SSV's arguments as to the

document's defects, *id.* at 23–26, but did agree with SSV that Commerce had "inadvertently

inflated the Agro Dutch data from 2005 to 2013 dollars using the Indian consumer price index, rather than the U.S. dollar consumer price index" and corrected that error.[1]  *Id.* at 26–27.

SSV asserts that defects with the Agro Dutch document still undermine the Department's findings, even with the corrected document now on the record.  First, SSV maintains that "Commerce denied SSV's due process rights by improperly re-opening the record . . . without giving SSV any opportunity to rebut that information or submit additional information supporting alternative calculations."  Pl.'s Comments at 9.  Next, SSV argues that ambiguities within the documents still exist[2] and, short of supplementing the record with a more complete excerpt, the documents do not provide support for Commerce's proposed resolution of such conflicts.  *Id.* at 11–12.  Last, SSV asserts that Commerce's decision to simply disregard the marine insurance "cannot . . . be reconciled with" 19 C.F.R. § 351.408(c)(1), *id.* at 12, and that Commerce's stated reason for departing from this regulation is "entirely circular."  *Id.* at 13.[3]

Each of these arguments are addressed in turn below.

---

[1] To this point, U.S. Steel argues that "[b]ecause the Agro Dutch data reflect the expenses incurred by an Indian company for domestic inland insurance in India, and because India was the country selected by Commerce for purposes of calculating surrogate values for [SSV], Commerce should have continued to use an Indian price index denominated in Indian rupees to inflate the Agro Dutch data from 2005 values to 2013 values."  Comments of U.S. Steel Corp. on the Final Results of Redetermination Pursuant to Court Remand 2, ECF No. 181 (Mar. 12, 2018).  U.S. Steel grounds its argument solely in a disagreement with Commerce's choice and does not argue that the decision is unsupported by substantial evidence.  As such, U.S. Steel has failed to carry its burden, 28 U.S.C. § 2639(a)(1), and its argument is dismissed.

[2] Specifically, SSV notes that, "[a]mong other things, those documents list two figures that appear to be unit prices: one is 2.00 and the other is 22.75. Commerce has asserted that the first of these prices is a per kilogram amount, and the second is a per-case amount."  Pl.'s Comments at 11.  Yet, SSV does not appear to further illuminate for the court what these "other things"—that is, alleged defects—are.

[3] Apparently as a supplement to its argument of bad faith, SSV also asserts that "Commerce officials responsible for this case are personally familiar with the actual cost of inland insurance paid by Indian OCTG producers during the relevant period," Pl.'s Comments at 14, and that this fact is "highly indicative of Commerce's state of mind."  *Id.* at 15.  As this argument goes to the alleged bad faith on the part of the Department, it has been addressed and dismissed above.

### 1. *Due Process*

SSV's due process argument centers around the idea that when Commerce opened the record to supplement the information as to the SV for inland insurance the Department should have afforded SSV an opportunity to rebut the new information placed on the record.  Not doing so, SSV argues, amounts to a denial of due process.[4]  However, SSV was on notice that the Agro Dutch data would be used to calculate inland insurance and declined its opportunity to rebut that information.  As a result, SSV has not suffered a violation of its due process rights.

Due process "is not a technical conception with a fixed content unrelated to time, place and circumstance;" rather, it "is flexible and calls for such procedural protections as the particular situation demands."  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).  Even if SSV has satisfied the threshold inquiry of demonstrating it has been deprived of a protected right, it must still demonstrate a lack of specific notice and opportunity to be heard.  *See In re Bailey*, 182 F.3d 860, 871 (Fed. Cir. 1999).  SSV has failed to do so as Commerce did indeed provide specific notice regarding the Agro Dutch data and SSV declined the opportunity to comment when U.S. Steel placed the document on the record.

In this proceeding, SSV argues not that it was denied an opportunity to comment on the Agro Dutch data but rather that "it had no reason to believe that Commerce would" assign a constructive value for inland insurance.  Pl.'s Comments at 9.  Indeed, SSV rested on its

---

[4] SSV also maintains that Commerce violated 19 C.F.R. § 351.301(c)(4), which states that "[a]n interested party is permitted one opportunity to submit factual information to rebut, clarify, or correct factual information placed on the record of the proceeding by the Department."  Yet, that regulation is inapposite here.  Where Commerce places a more legible copy of the *same* document on the record, that is not new information under the regulations and the interested party—in this case SSV—is not afforded the opportunity by right to submit rebuttal information.

contention that Commerce should not assign a value for inland insurance and did not argue in the

alternative that the record information was insufficient for such a calculation.  *See id.* at 10.

While the legibility of the original document is questionable, the notice it provided SSV

is not.  The document itself clearly provided SSV with actual notice that Commerce may

consider calculating a SV for inland insurance.  *See* U.S. Steel's Submission of SV Data, ECF

No. 60, Tab 16, Tab J (Jan. 17, 2014).  Not only did U.S. Steel label the document as

"CALCULATION OF SURROGATE VALUE FOR DOMESTIC INLAND INSURANCE," it

suggested that Commerce "value[] domestic inland insurance using information submitted by

Agro Dutch."  *See id.*  What's more, the document to which the Agro Dutch data was affixed, a

memo from Commerce related to SVs in a different proceeding, discussed the method used by

Commerce for valuing domestic inland insurance.  *See id.*, Tab J Attach. 2 at 6.  SSV cannot now

construe such overt notice as being deficient.  Given the circumstances, the court finds that the

notice given to SSV was adequate.  As such, SSV was on notice that the Agro Dutch data could

be used by Commerce to calculate inland insurance and, thus, can only articulate a due process

violation if the Department denied it an opportunity to be heard.

However, once on notice that the Argo Dutch data would be used for valuing inland

insurance, SSV declined to comment, thus rendering its due process claim without merit.

Indeed, SSV acknowledges that it did not rebut the information—or request a cleaner version of

the document be placed on the record—because it believed that its argument about Indian

common law sufficiently disputed the inland insurance premise altogether.  By so doing, SSV

left the document unrebutted as the sole source of valuing inland insurance.[5]  SSV could have

---

[5] That is, should Commerce decline to take SSV's view that there ought not be a valuation
of inland insurance.  Of course, Commerce declined to follow SSV's suggestion, and the court has
previously upheld that decision.  *See SeAH II*, 269 F. Supp. 3d at 1357.

alerted Commerce to the illegibility of the document at the time it was placed on the record

and—ideally—even stated SSV's desire that it be afforded an opportunity to rebut the document

when a more legible version was provided.  Ultimately, SSV did neither and cannot now claim

that it did anything but decline its opportunity to be heard on the subject.

As SSV received ample notice that Commerce may indeed value inland insurance using

the Argo Dutch data and SSV failed to comment on that data when it was placed on the record,

its claim for a denial of due process is without merit.

### 2. Alleged Ambiguities Within the Agro Dutch Document

SSV presents two primary challenges to Commerce's actions as they pertain to the Agro

Dutch worksheet: 1) that the two unit prices listed, 2.00 and 22.75, do not state their applicable

denominations and the Department should have corrected this error by placing a more complete

excerpt of the document on the record; and 2) that Commerce's "decision not to re-open the

record more widely to clarify any ambiguities cannot be sustained."  Pl.'s Comments at 11–12.

This all amounts to one specific claim of error and a more encompassing claim that Commerce

acted unreasonably.

Where a plaintiff seeks to challenge Commerce's determinations as not supported by

substantial evidence, it must present specific allegations demonstrating the insufficiency of

Commerce's reasoning.  *See* 28 U.S.C. § 2639(a)(1) (stating that Commerce's decisions are

presumed to be correct and that the "burden of proving otherwise shall rest upon the party

challenging such decision.").

Looking first to the alleged error as to the unit prices listed and their corresponding

denominations, Commerce reasoned that:

> The figure on this worksheet to which SSV cites as the gross unit price (which SSV
> believes to be $12.75/kilogram) is GRSUPR2U. It is clear on the worksheet that

> GRSUPR2U is $22.75. Based on the figures given on the worksheet for "cases," "kilos," and GRSUPR1U, we interpret GRSUPR2U to be the price per case, and GRSUPR1U to be the price per kilogram. Therefore, because the gross unit price (GRSUPR1U) is $2/kilogram, and not $22.75/kilogram, we continue to determine that the record evidence does not support SSV's allegation that the inland insurance SV we used was "incredibly inflated."

Remand Redetermination at 23–24.  An examination of the document in question confirms that

Commerce's reading was a reasonable one.  *See* Analysis Mem. for the Final Redetermination on

Remand, ECF No. 190, P.R. 11 Attach. 4 (Feb. 9, 2018).  As the GRSUPR1U and GRSUPR2U

values align to create roughly equivalent total prices—when interpreted using Commerce's

applied methodology—the court disagrees with SSV's suggestion that this was an unreasonable

interpretation.

     As to Commerce's decision to re-open the record for limited purposes, this court has

previously stated on multiple occasions that it will defer to Commerce's discretion, but will

nonetheless "review on a case-by-case basis whether the interests of accuracy and fairness

outweigh the burden placed on the Department and the interest in finality."  *Mid Continent Steel*

*& Wire, Inc. v. United States*, 41 CIT __, __, 203 F. Supp. 3d 1295, 1313 (2017) (quoting

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT __, __, 815 F. Supp. 2d 1342,

1365 (2012); *see also SeAH II*, 269 F. Supp. 3d at 1358 n.13.  Here, Commerce based its

decision to re-open the record for limited purposes in part on the fact that "SSV chose not to

submit [factual] information to value inland insurance by [the stated] deadline[s], despite [U.S.

Steel] having submitted the Agro Dutch inland insurance information" prior to the later of the

two deadlines.  *See* Remand Redetermination at 26.  SSV's argument that Commerce abused its

discretion is largely disarmed by its declining to either comment on or supplement the record at

the time the Agro Dutch data was first raised.  To now assert that Commerce acted unfairly

ignores SSV's own strategic decisions.  Accordingly, the court defers to Commerce's decision

with regard to opening the record and finds no element of unfairness that would contravene that discretion.

All in all, SSV has failed to satisfy its burden of proof.  In this instance, rather than merely asserting that there were ambiguities the Department failed to reconcile, SSV has the burden of demonstrating the Commerce's decision was improper.  By failing to engage with Commerce's reasoning and raising only one specific alleged ambiguity, SSV has failed to meet its burden.

### 3.  Commerce's Regulations

In relevant part, 19 C.F.R. § 351.408(c)(1) provides for situations in which the Department is to value the factors of production and states that:

> The Secretary normally will use publicly available information to value factors. However, where a factor is produced in one or more market economy countries, purchased from one or more market economy suppliers and paid for in market economy currency, the Secretary normally will use the price(s) paid to the market economy supplier(s) if substantially all of the total volume of the factor is purchased from the market economy supplier(s).

When quoting this regulation in its briefing, SSV conveniently ignores the discretion the regulation grants to Commerce.  Here, the Department stated that this was not a normal circumstance, warranting departure from the regulation because "the Agro Dutch information, which is the only data on the record, does not allow [Commerce] to separate the inland insurance costs from the marine insurance costs because they are represented as one value."  Remand Redetermination at 25.  As a result, Commerce determined that its methodology—"removing the marine insurance SV" from the combined insurance value—was "the only alternative to ensure that the marine insurance costs are not double counted."  *Id.* at 25–26.  The regulation cited by SSV "merely indicates a preference for market prices," *China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 27 CIT 255, 264, 264 F. Supp. 2d 1229, 1237 (2003), and does not mandate

Commerce's use of any one value.  Rather, Commerce retains the discretion to depart from the regulation's stated preference where appropriate.  In this case, the only evidence on the record as to inland insurance included marine insurance and the Department's decision to deduct the marine insurance was reasonable.  No other evidence on the record would have proved helpful and SSV has offered no other workable solution from other record evidence.  Accordingly, the court sustains Commerce's decision with regard to the inland insurance valuation.

### C.  Allocation of Brokerage and Handling Costs

Finally, the court addresses Commerce's determinations as to the allocation of B&H costs, remanded in the court's prior order for a more full explanation of the Department's reasoning.  *See SeAH II*, 269 F. Supp. 3d at 1365.  The court's previous order faulted Commerce for not directly confronting SSV's arguments that: 1) "Commerce's allocation provides aberrational results that are inconsistent with evidence regarding the actual per-unit brokerage and handling costs incurred by Indian exporters," *id.* at 1363; 2) "'any calculation' using Indian surrogate values that assumes a proportional relationship between cost and weight 'is necessarily contrary to the evidence on the record,'" *id.* at 1364; and 3) that "Commerce's reliance on the price formula in SSV's contract with a[ non-market economy ("NME")] freight forwarder is unreasonable," *id.*

On remand, Commerce addressed each these arguments and "continue[s] to find that [its] allocation methodology was reasonable."  Remand Redetermination at 14.  Looking to the court's first concern about B&H costs, Commerce determined that "merely because its calculated values for B&H are seven to 13 times greater than other values SSV placed on the record does not make Commerce's calculated value aberrational," *id.* at 14, finding that "this disparity is only a reflection of the fact that Indian B&H costs can vary widely," *id.* at 15 (citing *Honey from the*

*People's Republic of China*, 70 Fed. Reg. 74,764 (Dep't Commerce Dec. 16, 2005) (prelim. results & partial rescission)).  On the second point mentioned above, Commerce acknowledged that evidence on the record and prior departmental practice indicated weight was a proper means by which to allocate the disputed costs.  *Id.* at 15–16 (citing *Honey from the People's Republic of China*, 70 Fed. Reg. 74,764 and accompanying Issues & Decision Mem. at cmt. 4).  Last, the Department continues to "value B&H on a weight basis because this basis reflects SSV's own service contract," largely relying on statutory and regulatory directives to "calculate normal value in an NME proceeding by valuing the NME producers' factors in an ME country."  *Id.* at 16 (citing 19 U.S.C. § 1677b(c)(1)(B)(2); 19 C.F.R. § 351.408(a)).  Moreover, Commerce reasoned that "[a]lthough the contract does not show how a Vietnamese company would charge for services that covered only B&H, it is adequate to show that B&H costs can be incurred on a weight basis in Vietnam."  *Id.* at 30.

Here, SSV argues that Commerce improperly rejected its prior arguments in continuing to apply the same methodology for the allocation of B&H costs.  *See* Pl.'s Comments at 16–24. Specifically, SSV contends that: 1) Commerce's framework is unacceptable because it produced "results that are 7 to 13 times greater than the actual per-ton [B&H] costs reported by the Indian producers," *id.* at 17; 2) "Commerce improperly relied on a fee amount charged by a Vietnamese supplier for a bundle that includes freight and [B&H] services to determine the manner in which an Indian supplier would charge for separately itemized document preparation and customs clearance services," *id.* at 18; and 3) "Commerce's attempt to mix-and-match figures from the Doing Business Report with calculations from the GVN questionnaire response is fundamentally inconsistent," *id.* at 22–23.

Ultimately, by addressing each of SSV's arguments and dispensing of them reasonably, Commerce has adequately rectified the previous shortcomings that prevented the court from sustaining the Department's determinations. *See SeAH II*, 269 F. Supp. 3d at 1365.  In the court's prior opinion, there was a concern that "Commerce never responded to the[] legitimate critiques [made by SSV], and the court [could] not manufacture an answer for Commerce." *Id.* (citing *SEC v. Chenery*, 332 U.S. 194, 196 (1947)).  Of course, not only must Commerce confront SSV's arguments, it must *overcome* them.  That requires substantial evidence in the Department's favor.  Through reasonable and thorough analysis of each of the issues on remand, Commerce has done just that.

The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Importantly, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Ultimately, SSV's allegations are not enough to defeat Commerce's reasoning in this instance as substantial evidence supports the Department's findings.  Accordingly, the court sustains Commerce's allocation of B&H costs.

### 1. Allegedly Aberrational Results

Under 19 U.S.C. § 1677b(c)(1), Commerce is to determine the value of subject merchandise "based on the best available information . . . considered to be appropriate by the [Department]."  As this court has stated previously, "Congress has granted Commerce substantial discretion and has bound the Court to respect that discretion, even where the Court would have

reached a different conclusion . . . ." *Wonderful Chem. Indus., Ltd. v. United States*, 27 CIT 411,

418, 259 F. Supp. 2d 1273, 1281 (2003) (quoting *Shandong Huarong Gen. Corp. v. United*

*States*, 25 CIT 834, 159 F. Supp. 2d 714, 722 (2001)).  In particular, "Commerce has wide

discretion in selecting surrogate value data."  *Grobest*, 36 CIT at __, 815 F. Supp. 2d at 1351.

Where Commerce declines to rely on certain information and chooses other information on

which to base its ultimate determination, that decision is granted significant latitude so long as it

is supported by substantial evidence.

Here, SSV argues that Commerce's reliance on the values from the Doing Business

Report produced results that are so aberrational as to indicate that Commerce's methodology is

unreasonable.  SSV contends that the total B&H costs by Indian OCTG exporters "would work

out to $0.64 per metric ton [for document preparation and customs clearance costs], and the

terminal handling and port charges would work out to $10.36 per metric ton."  Pl.'s Comments at

17.  By contrast, the data adopted by Commerce, contained in the Doing Business Report, would

substantially increase costs by 7 to 13 times greater than the actual per-ton B&H costs reported

by the Indian producers.  *Id.*  SSV also maintains that its proposed methodology of relying on

evidence of values from individual Indian companies is better suited for these circumstances and

is "consistent with the other record evidence concerning the [B&H] costs incurred by Indian

exporters."  *Id.*

SSV has failed to establish how the other record evidence would have provided a

reasonable alternative to actual market conditions found in the Doing Business Report.

Ultimately, Commerce explained that just because the averages were higher did not mean that

they were aberrational; rather, Commerce reasoned that the higher values reflected the variability

of actual market conditions in India.  Remand Redetermination at 14–15.  Indeed, in so doing,

Commerce noted that it has previously rejected similar arguments when the results were alleged

to be even more inflated than what SSV has represented here.  *See id.* at 14–15 (citing *Honey*

*from the People's Republic of China*, 70 Fed. Reg. 74,764).  As the Department acted in line

with previous decisions and the application of that methodology was reasonable here, Commerce

cannot be said to have made an arbitrary determination in this instance.  What's more, this court

has previously upheld Commerce's decision to rely on country-wide reports, rather than

individual company data placed on the record.  *See Fine Furniture (Shanghai) Ltd. v. United*

*States*, 40 CIT __, __, 182 F. Supp. 3d 1350, 1368–69 (2016).  Considering these factors, the

Department's choice to consider market conditions in India rather than individual companies'

information on the record was reasonable.  As a result, SSV's results-based argument is

unconvincing.

### 2.  *Allocation of B&H Costs by Weight*

Next, Commerce's decision to allocate B&H costs by weight is also supported by

substantial evidence.  The Department relied on *Honey from the People's Republic of China*, 70

Fed. Reg. 74,764, finding that that that decision supported Commerce's findings here that: 1) the

data from the Doing Business Report is "representative of actual B&H prices paid" by exporters

in India, Remand Redetermination at 29, and 2) "Indian B&H costs can vary widely."  *Id.* at 30.

Specifically, SSV challenges the "separate amounts for document preparation or for

customs clearance;" rather, SSV asserts that its freight forwarder charged SSV "for a basket of

services that included freight from SSV's plant to the port, customs clearance, loading and

unloading [], and security services for the cargo . . . ."  *See* Pl.'s Comments at 19.  Additionally,

SSV argues that since the "pricing practice on which [Commerce] relies . . . is not a market-

economy transaction[,] . . . Commerce cannot, in good faith, rely on the fee structure used by

SSV's Vietnamese supplier to identify how a market-economy supplier in India would have set its fees." *Id.* at 20–21.

While SSV has highlighted evidence that shows that sometimes B&H costs may be allocated on a per-container basis, Commerce determined that in this instance it was more appropriate to do so based on weight. Specifically, Commerce pointed out that some of the B&H data on which SSV relies actually is charged based on its weight. *See* Remand Redetermination at 15–16 ("GVN indicated that two of the five categories of B&H expenses, (*i.e.*, 'agency charges' and 'other charges (various expenses)') are charged on a metric-ton basis."). That, in the Department's view, cut against SSV's argument because it showed that record evidence, submitted by SSV, demonstrated that there were indeed some Indian B&H costs charged by their weight. *Id.* at 16. And so Commerce found that it was reasonable to treat B&H costs in a similar manner here. As with the last issue, the court finds support for Commerce's position in a previous decision of this court sustaining the Department's calculation of B&H costs based on weight. *See Fine Furniture*, 40 CIT __, __, 182 F. Supp. 3d at 1368–69. Thus, not only is Commerce's general allocation of B&H costs based on weight reasonable, but so too is its inclination to do so in this case when SSV has failed to establish that a different methodology would be more prudent.

SSV then asserts that the transaction in question is not a ME transaction and so the Department erred in using the fee structure it applied. The Government contends that the Doing Business Report did lay out a fee structure for B&H costs in India and, therefore, "Commerce logically referred to a fee structure on the record—SSV's contract with its Vietnamese supplier." Def.'s Comments at 24. Indeed, Commerce pointed out that it had previously considered and rejected the argument about the fee structure issue in an earlier portion of the administrative

proceedings.  Remand Redetermination at 17.  Clearly, the Department has discretion to choose

the most appropriate values in calculating SVs, *Grobest*, 36 CIT at __, 815 F. Supp. 2d at 1351,

but it must pull that data *from the record itself*.  Accordingly, as Commerce's choice was a

reasonable exercise of its discretion and SSV has failed to identify any other record evidence on

which the Department could have relied, this challenge is denied.

### 3.  The GVN Questionnaire

Last, SSV argues that: 1) there is no evidence that the values pulled from the GVN

questionnaire were incurred on a per ton basis and 2) figures from both the GVN questionnaire

and the Doing Business Report cannot be reconciled with one another.  In essence, SSV argues

that "GVN's questionnaire response indicated that GVN paid a total of roughly $5.42 per ton for

all [B&H] services" such that Commerce "cannot plausibly justify [its] assertion that GVN's

questionnaire response supports Commerce's calculation of [B&H] costs of $75 to $85 per ton."

Pl.'s Comments at 23.[6]  For its part, the Government contends that the GVN questionnaire

"simply provided Commerce with additional factual support to justify Commerce's reasonable

inference that [B&H] fees for Indian OCTG producers vary by weight."  Def.'s Comments at 22.

"Commerce can, and does, mix and match the data that it chooses in its surrogate value

selection, for instance through the use of gap-filling data."  *Dorbest*, 30 CIT at 1684, 462 F.

Supp. 2d at 1275.  Commerce's overarching goal is to make its determinations based on the best

---

[6] Moreover, SSV argues that a decision relied upon by Commerce, *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 82 Fed. Reg. 26,912 (Dep't Commerce June 12, 2017) (final results), "is logically incoherent and does not provide a reasonable basis for allocating the Doing Business Report figures."  Pl.'s Comments at 23.  Yet, Commerce merely cited to *Diamond Sawblades* to show its practice in choosing a denominator from the same source as the numerator because those figures were "dependent upon one another."  Remand Redetermination at 34.  SSV's broad-based attack on the *Diamond Sawblades* decision misfires as it is not aimed at the purposes for which that decision was relied on by Commerce.

information available, an aim that takes precedence over any inclination to derive its results from

a single methodology or source.  *See Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442,

1446 (Fed. Cir. 1994).  As a result, SSV's bald assertion that certain information found in the

GVN Questionnaire cannot be reconciled with the Doing Business Report falls on deaf ears.

In any event, the Government's view of the GVN data is more consistent with

Commerce's reasoning.  Commerce stated that it could not determine from the record what the

exact B&H costs GVN paid for by weight, but that did not undermine its use of the Doing

Business Report.  Remand Redetermination at 32.  Thus, Commerce did not rely on the GVN

questionnaire in its findings, but merely provided that the GVN questionnaire did not detract

from its analysis.  *See id.*

Accordingly, SSV's characterization of Commerce's reliance on the GVN questionnaire

is misguided and even if it were accurate, the Department's methodology would be sustained.

## CONCLUSION AND ORDER

For the foregoing reasons, upon consideration of the parties' motions for summary

judgment and all papers and proceedings herein, it is hereby:

**ORDERED** that Commerce's determinations as to all issues raised on appeal are

supported by substantial evidence and are hereby sustained; it is further

**ORDERED** that final judgment is entered for Defendant.

Dated: August 13, 2018                                    /s/ Richard W. Goldberg
New York, New York                                          Richard W. Goldberg
                                                                    Senior Judge